UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PATRICIA FEARS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case no. 4:15CV1291 PLC |
| ) | |
| NANCY A. BERRYHILL,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

Patricia Fears ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying her applications for Disability Insurance Benefits and Social Security Income under the Social Security Act.[2] The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

*I.     Background and Procedural History*

On February 14, 2013, Plaintiff, then age fifty-three, filed her applications for Social Security benefits alleging that she was disabled as of December 31, 2012 as a result of "stress, anxiety, learning disability; arthritis in knees." (Tr. 91, 190-96, 197-202). The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 124-28, 130-31).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The Social Security Administration denied Plaintiff's previous applications for Social Security benefits on August 3, 2011. (Tr. 227).

1

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on March 17, 2014. (Tr. 31-70). At the hearing, Plaintiff testified that, after being homeless for about one and a half years, she obtained housing through the Missouri Department of Mental Health, Division of Developmental Disabilities. (Tr. 34). Plaintiff stated that she most recently worked about three to three and a half hours per day for a woman "down the street." (Tr. 40-41). Plaintiff quit because the woman "was mad at the world or something – got mad at everybody. Start screaming." (Tr. 42).

The ALJ noted that Plaintiff's work history reflected "self-employment 2006 to 2011. Cleaning." (Tr. 42). When he inquired about the types of places she cleaned, asking, "was it in offices, was it in restaurants?," she answered, "Hallways and stuff. Mainly a lot of hallways, just hallways." (Tr. 43). According to Plaintiff, that employer let her go and hired "a guy with a license." (Id.). Plaintiff never had a driver's license because she "tried it, but I never could pass [the test]." (Tr. 44). When Plaintiff took the driver's test, someone assisted her with the reading, "but they just kept going so fast that – I just walked out the door." (Id.). Plaintiff also had experience cleaning tables at a restaurant, but could not work a register. (Tr. 45). Plaintiff had never worked a full-time job and required help reading. (Tr. 44, 61).

In regard to her medications, Plaintiff testified that she took "anxiety medicine for anxiety and depression. And my asthma medicine and Seroquel," and "[a]spirins and stuff for my knees." (Tr. 46). Plaintiff testified that the medication she was taking for her mental health helped and she visited a therapist at Grace Hill every three months. (Tr. 47-48).

When the ALJ asked Plaintiff what she did on a typical day, she answered, "I sit outside on my steps." (Tr. 50). She testified that her son took her to the grocery store and she did laundry at a friend's house down the street. (Tr. 51). Plaintiff's case worker drove her to the

hearing and also assisted her with paperwork. (Tr. 52, 53). Another case manager, named Elizabeth, helped Plaintiff with "housing and stuff for my housing" and "paperwork and stuff also." (Tr. 54).

In regard to social interaction, Plaintiff testified that "a church lady friend….comes around," and Loving Care Church provided her with "coats, clothes, shoes" and "help[ed] out a little bit with food and stuff, bread, potatoes, rice." (Tr. 55). One of Plaintiff's sons had died, but her two surviving sons visited her about once a month. (Tr. 56). Plaintiff lived alone, and she cleaned her bathroom two or three times per week. (Tr. 56, 65). When the ALJ asked Plaintiff whether she raised her children "on [her] own," she answered only: "I had a lot of problems raising them in poverty, you know, it was hard." (Tr. 65).

During the hearing, Plaintiff's counsel observed that Plaintiff had "been looking off to the side at the wall the entire time" rather than at the judge. Plaintiff explained, "I've never experienced any of this stuff before." (Tr. 54). She later acknowledged "getting annoyed with [his] questions." (Tr. 57).

Plaintiff testified that she did not remember her childhood. (Id.). When Plaintiff's counsel asked the highest grade she completed, she replied, without answering the question, "Little [Humboldt] it's special school – special education." (Tr. 57). In an effort to present evidence relating to Plaintiff's education, Plaintiff's counsel asked what age she dropped out of school, and Plaintiff answered, "I think I was 16, I had a kid." (Tr. 58). Because Plaintiff's applications for benefits and testimony suggested that, at age sixteen, she was only in eighth or ninth grade, Plaintiff's counsel asked how many times she was "held back." (Id.). Plaintiff asked "What do you mean held back?," and he clarified, "How many times did you repeat a grade?" (Id.). Plaintiff answered, "Yea, never happen[ed], I don't remember that." (Id.).

3

A vocational expert (VE) also testified at the hearing. (Tr. 59-64). The ALJ asked the VE to consider a hypothetical individual with limited education who was approaching advanced age and was limited to light work and work that was "low stress," meaning "with only occasional decision making or occasional changes in the work setting," and work that "requires no interaction with the public and occasional interaction with coworkers." (Tr. 61-62). The VE testified that such person would be capable of performing Plaintiff's past relevant work as a cleaner, as well as the positions of hand packer, production worker, and housekeeper. (Tr. 62). However, if such individual were to miss three or more days of work per month, "the individual would soon be terminated." (Id.). Likewise, if the individual were limited to no contact with the public or coworkers, there would be no work available. (Tr. 63). Finally, the VE testified that, if the individual, "even when limited to the simple and routine tasks[,]… make[s] errors and require[s] supervisory intervention an additional five times per work day for the purpose of redirection, repeating instructions, how to fill out forms, et cetera," she would be terminated. (Tr. 63-64).

At the close of evidence, the ALJ noted that the medical evidence was "not particularly persuasive" and inquired what counsel "would ask me to do to further develop this case." (Tr. 64). Plaintiff's counsel requested a psychological evaluation with IQ testing, and the ALJ responded, "Frankly, counsel, I consider the IQ testing a waste of time." (Tr. 64-65). The ALJ explained:

> Again I not only have to have low IQ, I have to have deficits in adaptive functioning, she's practically 55 years of age. She's worked off and on, she's – you now, I just don't have any reason to believe she's mentally retarded. I mean, there's just no evidence of it. I don't have any doubt she's mentally disabled I know without doubt maybe she's a low IQ, but I don't have any reason to believe at all that she's mentally retarded. So I don't intend to do an IQ test.

4

(Tr. 65).

In a decision dated April 23, 2014, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a) [3] and found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from December 31, 2012, through the date of this decision[.]" (Tr. 12-24). The ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset date of December 31, 2012; (2) had the severe impairments of depressive disorder, anxiety, inguinal hernia, chronic obstructive pulmonary disease (COPD), and lumbar degenerative joint disease and facet arthropathy; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14-15).

After reviewing Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably have been expected to produce the alleged symptoms, but the alleged intensity, persistence, duration, and impact on functioning are not credible or consistent with the totality of the evidence." (Tr. 18). The ALJ found that Plaintiff had the residual functional capacity (RFC) to:

> [p]erform light work…except she can never climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; and must avoid exposure to concentrated levels of irritants such as odors, dusts, gases, fumes, and poorly-ventilated areas. Further, the claimant is capable of simple, routine, and repetitive tasks, but must work in a low-stress environment, defined as one requiring only occasional decision[-]making and occasional changes in work setting, and must have no interactions with the public and only occasional interactions with co-workers.

---

[3] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

(Tr. 18).

Based on the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work as a cleaner because "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity[.]" (Tr. 22). The ALJ made an alternative finding that, even if Plaintiff was not capable of performing her past relevant work, "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform[.]" (Tr. 23). The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 24).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on June 26, 2015. (Tr. 1-5, 8). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680

F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. Discussion

Plaintiff claims that substantial evidence does not support the ALJ's determination that she is not disabled. More specifically, Plaintiff contends that: (1) substantial evidence did not support the ALJ's finding that Plaintiff did not meet or medically equal Listing 12.05C, governing intellectual disability (formerly labeled "mental retardation")[4]; and (2) the ALJ erred in failing to include a pace limitation in the RFC. The Commissioner counters that substantial evidence supported: (1) the finding that Plaintiff neither met nor medically equaled Listing 12.05C; and (2) the mental limitations included in the RFC.

   A. *Listing 12.05C*

Plaintiff claims that the ALJ erred at step three of the sequential evaluation process when he: (1) determined, in the absence of a valid intelligence quotient (IQ) score, that Plaintiff did not meet Listing 12.05C; and (2) failed to explain his determination that Plaintiff did

---

[4] Effective January 17, 2017, the Social Security Administration amended the criteria in the listings used to evaluate claims of intellectual disability and eliminated listing 12.05C. See www.federalregister.gov/documents/2016/09/26/2016-22908/revised-medical-criteria-for-evaluating-mental-disorders (lasted visited Feb. 28, 2017).

medically equal Listing 12.05C.  The Commissioner counters that the ALJ did not err in failing to order an IQ test because Plaintiff did not demonstrate that she had deficits in adaptive functioning initially manifested prior to age twenty-two.[5]  In regard to medical equivalence, the Commissioner asserts that the Plaintiff "has no medically determinable impairment equating to significantly subaverage general intellectual functioning."  (ECF No. 21 at 5).

"[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary."  Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990)).  "That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and he is awarded benefits *without a determination whether he actually can perform his own prior work or other work.*"  Lott, 772 F.3d at 549 (emphasis in original) (quoting Sullivan, 493 U.S. at 532).  Because satisfying the listings during the third step yields an automatic determination of disability, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five-step evaluation.  Sullivan, 493 U.S. at 532.

Listing 12.05 states:  "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  Lott, 772 at 549 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05).  In addition to satisfying the requirements in the introductory paragraph, the claimant must also satisfy one of four sets of requirements – A, B, C, or D.  Id.  Listing 12.05C requires:  "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment

---

[5] The Commissioner does not dispute that Plaintiff satisfied the third requirement of Listing 12.05C, which is "a physical or other mental impairment imposing an additional and significant work-related limitations or function."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C.

imposing an additional and significant work-related limitation of function." Id. (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C). Thus, to meet listing 12.05C, a claimant must demonstrate: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age twenty-two; and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C).

Standardized intelligence test results are essential to determining whether a claimant meets Listing 12.05C. Lott, 772 F.3d at 549 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00D.6.b). "[I]t may be reversible error for an ALJ not to order a consultative examination when, without such an examination, []he cannot make an informed choice." Id. (quoting Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986)).

In this case, Plaintiff's most recent IQ test was administered in 1973, when she was fourteen years of age. (Tr. 285). At that time, Plaintiff had a full-scale IQ score of sixty-six.[6] (Id.). The limited educational records contained in the record reflect that Plaintiff received special education, her classification was "ungraded," and she dropped out of school after eighth grade. (Tr. 288). During the brief time Plaintiff attended ninth grade, she received mostly failing grades. (Tr. 287). In her 2013 psychological evaluation, Plaintiff informed Dr. Kimberly Buffkins that "her mother kept her from school and 'hid me from DFS'" and reported "not attending school until after her mother died around age 11." (Tr. 320). In her 2011 psychological evaluation with Dr. Lynn Mades, Plaintiff denied behavioral issues but admitted a history of truancy, running away, and staying out past curfew. (Tr. 304).

---

[6] Plaintiff's elementary school records revealed that, in 1969 and 1970, she had a full-scale IQ score of 67. (Tr. 285). IQ scores obtained between ages seven and sixteen are valid for only two years when the score is forty or above. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D).

At step three of the sequential evaluation process, the ALJ considered whether Plaintiff's impairment or combination of impairments met the severity of Listing 12.05C for intellectual disability. In regard to the IQ scale requirement, the ALJ explained: "The claimant's school records do include results from 1973 testing showing verbal, performance, and full-scale IQ's in the 60's. However, this testing was performed when the claimant was only 14 years of age. No additional testing confirms such low IQ scores persisted into early adulthood." (Tr. 17). Additionally, the ALJ found: "[N]o records document any deficits in adaptive functioning initially manifested prior to age 22." (Id.). The ALJ reasoned:

> [T]he claimant testified that she left school at age 16 because she had a child, rather than due to academic problems. She did not suggest that she was unable to care for this child or any other children, only testifying that it had been difficulty [sic] to raise her children due to poverty. Finally, I would note that the claimant resided alone on occasions as an adult and had a fairly consistent work history that included a year earning over $11,000.

(Id.). The ALJ concluded that, because the record did not establish deficits in adaptive functioning manifested prior to age 22, "further testing to establish her IQ score would be immaterial." (Id.).

Contrary to the ALJ's finding, substantial evidence in the record supported a finding that Plaintiff suffered a deficit in adaptive functioning prior to age twenty-two. The record reveals that Plaintiff did not attend school until age eleven, at which time she was placed in special education classes. Plaintiff struggled in special education classes, dropped out after eighth grade, and had a history of truancy and running away. Three IQ tests administered at different periods of Plaintiff's childhood revealed scores of 67, 67, and 66. Furthermore, Plaintiff did not obtain a GED and, despite receiving assistance on the written portion of the driver's test, she failed several times. Based on the substantial evidence, the ALJ should have found an onset of significantly subaverage intelligence with deficits in adaptive functioning prior to age twenty-

two. See e.g., Reed v. Colvin, 779 F.3d 725, 727 (8th Cir. 2015) (evidence of attending special education classes, repeating several grades, and having problems with math and learning to read constituted evidence that mental retardation manifested itself before age twenty-two); Maresh, 438 F.3d at 900 (evidence of taking special education classes, dropping out of school, having trouble with reading, writing, and math, and having frequent fights with other children constituted evidence of deficits in adaptive functioning prior to age twenty-two).

The Commissioner argues that the record contained no evidence that Plaintiff's low childhood IQ scores persisted into adulthood. However, "[i]n the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ [has] remained relatively constant." Lott, 772 F.3d at 550 (quoting Sird v. Chater, 105 F.3d 401, 402 n. 4 (8th Cir. 1997)). The record reveals no such change in Plaintiff's intellectual functioning.

Additionally, the Commissioner maintains that Plaintiff was not intellectually disabled because Plaintiff: lived alone; had no problems with personal care, cooking, shopping, and household chores; and worked off and on for more than twenty years prior to her alleged onset date. However, "Listing 12.05C assumes that the mildly-retarded can work if their only impairment is mild mental retardation." Lott, 772 F.3d at 551. Indeed, the Eighth Circuit has recognized that "mildly mentally retarded individuals usually achieve vocational and social skills adequate for minimal self-support." Reed, 779 F.3d at 726 (citing Lott, 772 F.3d at 551-52). Consequently, evidence of past work or the performance of rudimentary activities of daily living does not necessarily preclude a finding that the claimant meets Listing 12.05C.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Lott, 772 F.3d at 549 (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). Given that Plaintiff satisfied the

second and third requirements for a finding of intellectual disability under Listing 12.05C, the ALJ should have ordered an IQ test to determine whether Plaintiff had a verbal, performance, or full scale IQ of 60 through 70. See, e.g., Lott, 772 at 551-52. Because Plaintiff must be afforded an IQ test and a reevaluation of her disability applications, we do not reach her other assignments of error. See, e.g., Id. at 552.

## I. Conclusion

For the reasons set forth above, the court finds that substantial evidence did not support the Commissioner's decision that Plaintiff does not meet Listing 12.05C. The Commissioner's decision is reversed and remanded with directions to return this case to the Commissioner for further development of the record. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A judgment of reversal and remand shall accompany this memorandum and order.

*/s/ Patricia L. Cohen*
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of February, 2017